**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-0313-JEB** |
| **ROGER KENT BAUGH,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Roger Kent Baugh ("Baugh" or "defendant"), to eleven months' incarceration, at the mid-point of the stipulated guideline range of 8 to 14 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for the count of conviction.

### I.    INTRODUCTION

The defendant Baugh violently participated in the January 6, 2021, attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.8 million in losses.[1]

Baugh came to Washington, D.C. to attend the Stop the Steal rally with Mark Mazza, a 57-

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

year-old Army veteran from Shelbyville, Indiana.  Mazza brought two loaded handguns with him

to Washington, D.C. when he attended the "Stop the Steal" rally on the National Mall on January

6, 2021: a Smith and Wesson, .40 caliber semi-automatic handgun, and a .45 caliber/.410 caliber

revolver (the "Taurus Judge").[2]  Baugh was aware that Mazza was armed with the Taurus firearm

prior to attending the rally on January 6, 2021.  After attending the rally, Baugh and Mazza

marched to the U.S. Capitol and joined in efforts to move through restricted Capitol grounds.

Baugh and Mazza moved up the West side of U.S. Capitol Building toward the Lower West

Terrace ("LWT"), which led to an entryway into the U.S. Capitol Building.

In the LWT tunnel, the pair joined a mob of other rioters who were trying to break through

the police line to gain entry to the lower level of the U.S. Capitol Building.  Mazza was the first to

enter the LWT tunnel, but both engaged in multiple efforts to break through the police line.  Baugh

knew what the rioters were doing, and saw in vivid detail what was happening in the LWT tunnel

before he entered that violent arena.  Baugh entered the LWT tunnel after Mazza and engaged in

several heave-ho efforts with the violent mob, which was designed to dislodge officers from their

position defending the U.S. Capitol against the mob.  Baugh and Mazza left the U.S. Capitol

together, and subsequently left the District of Columbia.  Though Baugh's conduct was not the

same as Mazza, he was aware Mazza had a firearm and was attempting to accomplish the same

goal as Mazza.  Baugh further knew that Mazza had stolen a police baton during the riot, and he

knew enough to lie about it to federal law enforcement when he was interviewed after Mazza's

---

[2] The Taurus Judge is a five-shot revolver capable of chambering both .45 colt and 410 shotshell
(projectiles that contain pellets that disperse in a circular pattern upon firing, like those fired by a
shotgun) ammunition. See https://www.taurususa.com/revolvers/taurus-judge (visited September
15, 2022).

arrest.  Mazza was charged and pled guilty in case 22-cr-736, and this Court sentenced Mazza on October 21, 2022, to a total of 60 months' incarceration, followed by three years' supervised release and other conditions.

Based upon the conduct in his case, the government recommends that the Court sentence Baugh to a total of 11 months' incarceration, which is at the mid-point of the sentencing guidelines' range of 8-14 months.  This recommended sentence would reflect the gravity of Baugh's criminal conduct, his personal characteristics, and acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 8, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in their effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. At 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral

system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. At 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This

included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.  *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.**     **Defendant's Role in the January 6, 2021 Attack on the Capitol**

As described in Baugh's Statement of Offense, ECF 8, on the morning of January 6, 2021, Baugh and Mazza attended the rally at the Ellipse, and at approximately 1:45 p.m., they followed calls to go to the U.S. Capitol and began walking with others from the rally down Pennsylvania Avenue, N.W. to the U.S. Capitol.  At the time they did so, Baugh was aware that Mazza was armed with a firearm.  As they entered the U.S. Capitol Grounds, they walked past signs bearing readily visible warnings printed in large font posted on overturned barriers that clearly stated the area was closed to the public.  Image 1, below, is a selfie-style photograph that Mazza and Baugh took that shows their appearance and clothing on January 6, 2021, before the riot began (Baugh circled in blue).



**<u>Image 1</u>**

As they walked, the two entered restricted U.S. Capitol Grounds where then Vice President

Pence was presiding over the Electoral College certification vote by the United States Congress.

Neither Mazza or Baugh had authorization or permission to enter U.S. Capitol Grounds, or to

possess any firearm.[3]   At approximately 2:30 p.m., Mazza dropped or lost the Taurus Judge

revolver on the steps leading up to the West Front Terrace of the U.S. Capitol. At approximately

2:30 p.m. on January 6, CW-2, a U.S. Capitol Police Sergeant who was assaulted on the front of

---

[3] It is unlawful to carry a firearm on U.S. Capitol Grounds unless authorized under U.S. Capitol
Board Regulations.  *See* 40 U.S.C. § 5104(e)(1)(A) (Count Eight of the Mazza Indictment).

the LWT of the U.S. Capitol Building, recovered the Taurus Judge when it was dropped by the rioter who was assaulting him.[4]

Baugh and Mazza then continued up the West Front Terrace of the U.S. Capitol to a tunnel that led to a doorway inside the U.S. Capitol building.  There, rioters broke through the doors and were fighting U.S. Capitol Police ("USCP") and D.C. Metropolitan Police Department ("MPD") officers who were blocking their efforts to enter the building.  Upon arriving at the entrance to the LWT tunnel, Baugh saw rioters assaulting, hitting, and throwing objects at the police officers and using deadly and dangerous weapons against them.  Baugh also observed that the rioters were disarming officers, and physically and violently trying to push the officers over and out of the doorway so they could unlawfully enter the building.

### 1. The Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack. One of the most violent confrontations on January 6 occurred in and around the LWT tunnel where Mazza and Baugh entered.  They formed part of a large group of violent rioters who brutally attacked a

---

[4] The USCP Sergeant was unable to identify Mazza from a photo array as the person who assaulted him and dropped the gun.

vastly outnumbered group of police officers who valiantly sought to prevent the breach of the Capitol in that location. That entrance to the Capitol usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day, as shown in Image 2; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Image 2**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  USCP and MPD officers were arrayed inside the doorway and guarding the entrance.  By the time Mazza and Baugh arrived in the LWT tunnel, many of these officers had already physically engaged with the mob for over an hour, having reestablished a defensive line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges:* Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

10

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).

Despite the mob's efforts, the officers in the LWT tunnel held the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.

*Id.* (Statement of Officer Michael Fanone).

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to

injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### 2.      *Baugh's Actions in the LWT Tunnel*

Baugh and Mazza moved up the Northwest staircase together at approximately 2:50 p.m., but then they were separated.  Exhibit 1 is compiled video footage from two separate videos, that is being provided through USAFx.  Video 1 is silent CCTV footage with a time/date indicator from the Lower West Terrace doors between 2:53 p.m. and 3:20 p.m., and Video 2 is "*UNBELIEVABLE Footage: Trump Supporters Battle Cops Inside the Capitol*, uploaded January 7, 2021, located at https://www.youtube.com/watch?v=cJOgGsC0G9U ("Unbelievable Video"), which was recorded inside the LWT tunnel during the same period.   The two videos have been synced so the exhibit shows footage of both the front view CCTV footage (which has no audio) and the activity inside the tunnel at close range in the Unbelievable Video from the rioters' viewpoint (which does have audio).  This exhibit shows Baugh and Mazza's activity in the LWT tunnel.

At approximately 3:08:29 p.m. Mazza entered the tunnel area while using his scarf as a cover over his face.   Exhibit 1 further shows Mazza assisting a group of rioters by pushing with others from behind while the group forced its way towards the USCP and MPD officers who were defending the LWT tunnel door entrance to the U.S. Capitol.  The MPD Officers were wearing helmets, body armor, and distinctive police attire emblazoned with the words police and "Metropolitan Police Department."  At least 20 MPD and USCP Officers were resisting the mob's efforts to gain entry and were enduring constant attack inside the tunnel while Mazza was there.

At approximately 3:09:32 p.m. (16:22 mark of Exhibit 1) Baugh moved to the mouth of tunnel area and observed rioters assaulting officers further inside the tunnel at the entrance to the doors.  He saw broken glass, violence directed against plainly marked officers, and the rioters attempting to overpower the officers to gain entry to the U.S. Capitol.  Baugh also saw rioters forcibly attacking the officers and taking law enforcement riot shields from the officers in the front of the tunnel and giving them to other rioters in the back of the line.  Baugh further observed rioters pushing the same law enforcement riot shields toward the front of the line where a group of rioters then used the shields taken from the officers against the officers at the front.  Baugh also  observed officers order the rioters to stop, physically push the crowd back, and deploy OC spray on the rioters to try to stop the ongoing assault.  Image 3 (from Exhibit 1) shows where Baugh came to the mouth of the LWT tunnel and began observing what was happening inside the tunnel.



**Image 3**

As fellow rioters called for more people to push through the police line, at approximately 3:12:11 p.m. (19:01 of Exhibit 1), Baugh entered the tunnel and assisted other rioters who were pushing against the officers who were resisting rioters who were trying to push through officers stationed at the first set of doors in the tunnel. The group of rioters in the tunnel was pushing forward and yelling, "heave-ho!" Baugh joined in this effort and pushed against the back of other rioters who, in turn, were physically pushing against the officers who were guarding the door from access by the rioters. Image 4 shows a moment when Baugh was pushing.



**Image 4**

These "heave-ho" efforts - by which multiple rioters collectively used their body mass for greater force in pushing back officers by gaining momentum through leaning back and then pushing forward while chanting "heave-ho" to coordinate their efforts - resulted in contact between the rioters and the officers with significant physical force and pressure being placed upon the officers at the front of the tunnel. The "heave-ho" efforts were partially successful in moving the officer line further down the tunnel area. The "heave ho" was made against the direction and active resistance of the MPD and USCP officers in the tunnel, and during these pushes, other rioters used flag poles, batons, sticks, and stolen law enforcement shields as weapons to strike at, hit, and try to force their way through, multiple MPD and USCP officers. Inside the tunnel, Exhibit 1 shows the officers were actively resisting the rioters and used batons and shields to push back the rioters, including Baugh, and yelled at them multiple times to back up, disperse, and leave. Officers who

were being obstructed and pushed by these rioters included MPD Officer M.F., Officer J.A., Officer H.F., Sgt. J.P., Officer D.H., Officer P.N. and Officer O.F.

Baugh retreated from LWT tunnel at approximately 3:14:30 p.m., and he again took a position at the mouth of the tunnel, watching the rioters continue to attack the officers. Mazza was one of those persons inside the tunnel, as he remained actively resisting officers inside the tunnel with other rioters. Shortly thereafter, Mazza took a metal baton from an officer at struck him in the arm and yelled inside the tunnel, "This is our fucking house! We own this house! We want our house! Get out of the citizen of the United States' way!"[5]

After failing to break through the line of officers, Mazza moved from the front of the tunnel to the back of the tunnel area at approximately 3:15:30 p.m. (22:19 of Exhibit 1). Mazza showed other rioters and Baugh the baton that he had taken from the officers, and he then encouraged other rioters to enter the tunnel area to assist in pushing through the officers. While Mazza pulled other rioters into the tunnel area to attack and push against the MPD Officers at the front of the tunnel, Baugh looked at Mazza and proceeded into the tunnel to assist other rioters engage in further heave-ho pushes against the law enforcement in the tunnel. *See* Images 5 and 6 (Mazza is red circle, and Baugh is in blue circle).

---

[5] The specific victim of that strike, MPD Officer P.N., did not suffer a specific injury from Mazza's baton blow, as described in Exhibit 2 (Victim Impact Statement of MPD Officer P.N.), Mazza's assault on him was one of several violent assaults he suffered on that day. MPD Officer P.N. suffered several injuries on January 6, 2021, included two partially torn ligaments in his shoulder and temporary incapacitation from OC spray and bear spray used by the rioters.



**Image 5**



**Image 6**

Starting at approximately 3:15:43 p.m. (22:33 of Exhibit 1), Baugh entered the tunnel for a second time.  There, Baugh and the other rioters continued to obstruct the officers and push forward and again yell, "heave-ho!"  Baugh continued to push with the other rioters until approximately 3:17:55 p.m.  Officers who were being obstructed and pushed by the rioters at this time also included MPD Officer M.F., Officer J.A., Officer H.F., Sgt. J.P., Officer D.H., Officer P.N. and Officer O.F.  While the rioters were physically pushing against the officers, the officers told the rioters to get back and to exit the tunnel area, but the rioters obstructed and interfered with those efforts.  Baugh left the tunnel area as law enforcement officers were successfully pushing the rioters back from the doorway area, at approximately 3:18:30 p.m.  Mazza was pushed out at approximately 3:18:50 p.m. (25:20 of Exhibit 1).

Exhibit 1, between time stamps 16:22 and 25:41, captures much of the violent activity inside the LWT Tunnel while Baugh was at the mouth of the tunnel or inside the tunnel.  The intent of these rioters, including Baugh, was clear: to overcome the officers with force and gain violent entry into the U.S. Capitol to obstruct the Electoral College certification.  During the period that Baugh was in the tunnel, dozens of police officers were repeatedly assaulted.  Among them was MPD Officer Daniel Hodges, whose head was caught between a door frame and a rioter's shield as another rioter ripped off his gas mask and struck him about the head with his own baton. See Exhibit 1 at 3:11:20 p.m. to 3:13:30 p.m. (18:11 to 20:14 of Exhibit 1).[6]  *See Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117

---

[6] As noted above, Baugh entered at 3:12:11 p.m. and left the first time at 3:14:30 p.m.

Cong. (July 27, 2021) (Statement of Officer Hodges) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Police successfully ejected Mazza and other rioters from the tunnel at approximately 3:19 p.m. Even after being forcibly ejected from the tunnel and observing extreme violence against the officers, Mazza and Baugh remained on the Capitol Grounds for several hours and observed additional attacks on officers in the LWT tunnel area. Mazza and Baugh did not leave the area until police used flash-bang grenades to disperse the crowd later that evening. Further investigation has indicated this occurred at approximately 5:00 p.m.

### 3.       *Victim Information*

There were numerous law enforcement victims who suffered physical and psychological injury from the actions of rioters who were acting in concert with Mazza and Baugh in the LWT Tunnel, including MPD Sgt. P.N. While the primary victim in an 18 U.S.C. §231(a)(3) offense is the law enforcement agency, the government is providing video statement from MPD Commander Ramey Kyle, who was the highest-ranking officer in the LWT tunnel between approximately 2:30 p.m. and 5:00 p.m., to supplement the record regarding the impact Baugh's crimes had on the officers. *See* Exhibit 3 (which is being provided through USAFx).[7] In the statement, Commander Kyle describes the violence that he observed from Baugh and other rioters in the LWT tunnel that was directed against him and his fellow officers, and the impact this had on them. This information

---

[7] The statement includes footage taken from the following other video of the Lower West Terrace (LWT) tunnel on January 6, 2021: (1) body worn camera footage ("BWC") of MPD Sgt. William Bogner; (2) BWC of MPD Officer Bronson Spooner; (3) closed circuit television from the U.S. Capitol (camera #74); (4) video obtained from defendant Louis Cantwell 21-cr-89 (EGS); (5) the "*UNBELIEVABLE Footage: Trump Supporters Battle Cops Inside the Capitol*" video, which is part of Exhibit 1; (6) BWC of MPD Sgt. Jason Mastony; (7) BWC of Sgt. Joseph Austin; and (8) BWC of Sgt. Bernard Grimsley.

describes the physical and emotional impact the rioters had on the officers who were assaulted in the LWT tunnel at the time of Baugh's actions.

### 4.   Baugh's Actions After the Riot

After leaving the District of Columbia, Mazza drove home with Baugh, while still possessing the stolen baton and the loaded .40 caliber firearm.  On January 8, 2021, Mazza, while in Indiana, filed a report, by telephone, with the Shelbyville Police Department (SPD) in Indiana, falsely stating that his Taurus Judge was stolen in the state of Ohio.  Baugh was aware that Mazza lost a firearm at the U.S. Capitol and that he intended to file a false police report.

After Mazza was arrested on November 17, 2021, Federal Bureau of Investigation (FBI) agents interviewed Baugh on November 19, 2021, in Louisville, Kentucky.  Baugh acknowledged to the FBI that he and Mazza attended the Stop the Steal rally, and that they both entered the U.S. Capitol Grounds.  Baugh acknowledged that Mazza had a firearm in his possession, and that he lost the firearm at some point at the U.S. Capitol.  Baugh was asked specifically whether he went into the tunnel area to the U.S. Capitol and whether he was involved in any violence against officers.  Baugh falsely denied entering the tunnel area, and he also denied being involved in any violence against officers.

As recounted in the Statement of Offense, on or about February 23, 2022, Baugh was subpoenaed to attend the grand jury in the District of Columbia in the case against Mazza, and he was provided full subject warnings.  Baugh declined an offer to obtain counsel on his behalf, or to have one appointed for him, and he voluntarily came to a witness conference in the District of Columbia on March 3, 2022 before his grand jury appearance.  After being warned about the possible penalties for lying or obstructing justice before a grand jury, and being advised of his

rights, in the witness conference with an Assistant U.S. Attorney and a U.S. Capitol Special Agent, Baugh repeated inculpatory information about Mazza that he had provided the FBI about Mazza, but he again falsely denied entering the LWT tunnel area, or being involved in any violence against officers on January 6, 2021.  Statement of Offense, ECF Dkt. 8, ¶ 19.

Prior to appearing before the grand jury, Baugh attended another witness conference where he was confronted with video evidence that contradicted his prior statement that he had not entered the LWT tunnel or been involved in violent acts.  Baugh was advised again about his right to counsel, after which Baugh was appointed counsel by this Court.  Baugh subsequently obtained counsel and confirmed that he had in fact entered the LWT tunnel and was involved in pushing the officers as part of the heave-ho activities.  Id., ECF Dkt. 8, ¶ 20.  Since that time, Baugh debriefed with the government about his own conduct, and has been fully cooperative with law enforcement.

## III.    THE CHARGES AND PLEA AGREEMENT

On October 21, 2022, Baugh was charged by information with one count of Civil Disorder, in violation of 18 U.S.C. §231(a)(3).[8]  He pled guilty that same day to that single charge.

---

[8] On December 15, 2021, Mazza was indicted on thirteen offenses: Count One, violation of 18 U.S.C. 231(a)(3) (civil disorder); Count Two, violation of 18 U.S.C. § 1512(c)(2) (obstruction of a proceeding before Congress on January 6, 2021) Count Three, violation of 18 U.S.C. § 1512 (c)(2) (obstructing a grand jury proceeding on January 8, 2021); Count Four, violation of 18 U.S.C. 111(a)(1) and (b) (assaulting officers with a deadly weapon); Count Five, violation of 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building with a deadly or dangerous weapon); Count Six, violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted building or grounds with a deadly weapon); Count Seven, violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building with a deadly or dangerous weapon); Count Eight, violation of 40 U.S.C. § 5104(e)(1)(A) (unlawful possession of a firearm on Capitol Grounds or Buildings); Count Nine, violation of 40 U.S.C. § 5104(e)(2)(F) (violent entry and disorderly conduct on Capitol Grounds); Count Ten, violation of 22 D.C. Code § 4504(a)(unlawful possession of a firearm without a license outside the home or place of

## IV.    STATUTORY PENALTIES

Baugh now faces sentencing on Count One.   As noted by the plea agreement and the U.S. Probation Office, Baugh faces up to five years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government has no objection to the PSR for its calculations under the sentencing guidelines.

The PSR and the plea agreement lay out the same Guidelines analysis for Count One, as follows:

18 U.S.C. § 231(a)(3)

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 2A2.4[9] | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | | +3 |
| | | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | -2 |

business); Count Eleven, violation of 7 D.C. Code § 2502.01(a)(possession of an unregistered firearm); Count Twelve, violation of  D.C. Code 2506.01(3)(unlawful possession of ammunition), and Count Thirteen, violation of 22 D.C. Code §§  3211, 3212(b) (second degree theft).  *United States v. Mark Mazza,* 21-cr-736.

On June 17, 2022, Mazza pled guilty to Count Four, charging a violation of 18 U.S.C. 111(a)(1) and (b), and to Count Ten, charging carrying a pistol without a license in violation of the DC Code.  On October 21 2022, this Court sentenced Mazza to 60 months' incarceration on the Section 111 conviction and 6 months' incarceration on the firearms offense, to run concurrently.

[9] 18 U.S.C. §231(a)(3) does not have a guideline in Appendix A to the U.S.S.G., but the parties have agreed that §2A2.4 is the most analogous guideline.

**Total Adjusted Offense Level:**                                                                      **11**

*See* Plea Agreement at ¶¶ 5(A); PSR at ¶¶ 42-53.[10]

The U.S. Probation Office calculated Baugh's criminal history as category I, which the government does not dispute.  PSR at ¶¶ 54-56.  Accordingly, based on the government's calculation of Baugh's total adjusted offense level, after acceptance of responsibility, at 11, Baugh's sentencing guideline imprisonment range is 8 to 14 months, Zone B.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Baugh's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  The nature and circumstances of Baugh's offense were of the utmost seriousness, and fully support the government's recommended sentence of 11 months' incarceration.

In particular, Baugh and Mazza were working together to achieve a common goal, that is to enter the U.S. Capitol through the LWT tunnel by overwhelming the officers protecting the entranceway.  Upon approaching the Capitol, Baugh and Mazza observed the crowd pushing past

---

[10] Based on the facts and circumstances of this case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because the sentence recommended above would be sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § § 3553(a)(2).

police lines and breaching the U.S. Capitol security perimeter.  Moreover, despite observing the tremendous violence inside the LWT tunnel, both Baugh and Mazza continued their efforts in the LWT tunnel and made a concerted effort to break through that police barricade.

Baugh also entered the LWT tunnel on more than one occasion, and each time he entered the tunnel he assisted the other rioters in the tunnel in their combined efforts to overwhelm the officers with joint physical force.  Baugh was inside the LWT tunnel for several minutes on each occasion, and he was well aware of what his effort was doing to the officers at the front of the tunnel entrance.  In particular, Baugh's second effort in entering the tunnel and pushing through the police line – which came after Mazza came out of tunnel and sought reinforcements – was longer than the first, and powerfully demonstrates that he knew what he was doing, and that he was not there by mistake or through some misunderstanding.

Baugh's interaction with law enforcement after Mazza's arrest is also troubling.  While he spoke with law enforcement, and provided information about Mazza, he more than minimized his own conduct, rather he gave specific false statements about his own actions.  Unlike Mazza, however, Baugh's false statements did not have an effect of substantially obstructing justice as he only lied about his own conduct, and his false statements were discovered shortly thereafter (and before any testimony before the Grand Jury had occurred)

### B.  Baugh's History and Characteristics

Baugh, 51 years old, is a self-employed auto body repairman, who has three children, all of whom are over 18 years of age.

Baugh has no prior criminal convictions but does have several encounters involving

domestic violence and a number of traffic offenses.[11]   *See* PSR ¶ 58.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Baugh's criminal conduct involved an active and persistent effort to physically harm law enforcement officers who were trying to ward off an angry mob intent on obstructing the peaceful transition of political power under the U.S. Constitution.  Baugh not only joined in Mazza's goals, whom he knew was armed with a firearm, but his own efforts were designed to push past officers resisting them to gain violent entry into the U.S. Capitol.  He also knew that Mazza was filing a false police report about losing the firearm at the U.S. Capitol , and he lied to law enforcement when they questioned him about his own activity in the LWT tunnel.  These acts are the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

---

[11]  Baugh was charged with traffic offenses (often for speeding) on 23 different occasions, of which 19 were between 2011 and 2019.  Most of the offenses were "amended down" or dismissed.  PSR ¶¶ 57-58.  Additionally, in November 2022, he was again charged with speeding.  PSR ¶ 60.
[12]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Baugh was involved with violence toward law enforcement in the LWT tunnel on two separate occasions.  Second, Baugh was not fully truthful with law enforcement about his own conduct, nor did he come forward to report Mazza's false police report about the firearm of his own volition.   Finally, Baugh did not show any remorse for his conduct prior to accepting responsibility in this case.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[13] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In *United States v. Nolan Cooke*, 22-cr-52(RCL), Cooke was convicted of a violation of 18 U.S.C. § 231. Cooke was one of the first to breach the bike rack barriers on the east side of the Capitol; he physically pushed past officers; encouraged others to force their way into the building; and used his flagpole to strike at a window of the Capitol. Like Baugh, Cooke engaged in direct physical contact with law enforcement. Like Baugh, Cooke faced a sentencing guideline range of 8 to 14 months' imprisonment.  The court sentenced Cooke to 12 months and a day incarceration, and 36 months' supervised release.

In *United States v. Ronnie Presley*, 21-cr-257 (RDM), the defendant forcibly entered the U.S. Capitol and entered the Rotunda, where he stayed for approximately 20 minutes.  He resisted officers who were trying to remove him, and he also pled guilty to one count of 18 U.S.C. § 231(a)(3).  Pressley was in criminal history category II; accordingly, although he had the same offense level as Baugh, he faced a guideline range of 10 to 16 months' incarceration.  The Court sentenced Presley to 12 months' incarceration and 26 months of supervised release.

In *United States v. Moises Romero*, 21-cr-677 (TSC),  the defendant entered the Capitol building once through the Senate Wing Door and a second time on the east side of the building, and grabbed the corner of a police officer's riot shield.  Like Baugh, Romero faced a guideline range of 8 to 14 months' imprisonment.  The court sentenced Romero to 12 months and a day of incarceration, and 12 months of supervised release.

Taken together, these cases confirm that Courts have given defendants incarceration sentences for January 6th defendants who were involved in assaultive conduct.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[14] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Baugh must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[15]  Plea Agreement at ¶ 11.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a total sentence of imprisonment of eleven (11) months, which represents the mid-point of the recommended guidelines, restitution of $2,000, and the mandatory $100 special assessment for the count of conviction.  This sentence would also be consistent with the agreement between the

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

parties.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY: _____/S/_____
　　　Tejpal S. Chawla
　　　D.C. Bar No. 464012
　　　Assistant United States Attorney
　　　National Security Section
　　　U.S. Attorney's Office
　　　601 D Street, N.W., 5th Floor
　　　Washington, D.C. 20530
　　　Office: 202-252-7280
　　　Tejpal.Chawla@usdoj.gov